1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
2                   WESTERN DIVISION

3    ERICKA BENEDICTO,

4          Plaintiff,
        v.                          No. 4:14CV00610 BSM
5
                                    March 21, 2016
6                                   Little Rock, Arkansas
                                    8:57 a.m.
7    CITY OF LITTLE ROCK,

8          Defendant.

9

10              **TRANSCRIPT OF JURY VOIR DIRE**
           BEFORE THE HONORABLE BRIAN S. MILLER,
11              UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   On Behalf of the Plaintiff:

15       MS. ERICKA BENEDICTO, Pro Se
            39 Crape Myrtle Place
16          Little Rock, Arkansas  72210

17

18   On Behalf of the Defendant:

19       MR. WILLIAM C. MANN, III, Attorney at Law
            Little Rock City Attorney's Office
20          500 West Markham, Room 310
            Little Rock, Arkansas  72201

21

22        Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
23   transcription.

24

25


                 Judith A. Ammons, RPR, CRR, CCR
                    United States Court Reporter

1          P R O C E E D I N G S

2          (Proceedings commencing in open court at 8:57 a.m.;

3     prospective jurors present.)

4               THE COURT:  All right.  Mr. Mann, and, Ms. Benedicto,

5     have y'all had a chance to talk about your exhibits?

6               MR. MANN:  No, Your Honor.  We've just gotten here and

7     gotten together.  We haven't had but a minute.

8               THE COURT:  Do you need a couple of seconds, or do you

9     want to go -- we can go on and start selecting the jury and

10    then during a break you can get together?

11              MR. MANN:  That would be fine, Your Honor.

12              THE COURT:  It shouldn't take very long, should it?

13              MR. MANN:  No, sir.

14              THE COURT:  All right.  You can have a seat and we'll

15    get started.

16              MR. MANN:  And I would have one item for you, Your

17    Honor, at the conclusion of the jury selection.  It won't take

18    but a minute.

19              THE COURT:  Okay.  Thank you.

20         Okay.  Ladies and gentlemen, we are set to start the case

21    of Ericka Benedicto versus the City of Little Rock.  The case

22    number is 14CV610.

23         Ms. Benedicto, are you ready?

24              MS. BENEDICTO:  Yes.

25              THE COURT:  And, Mr. Mann, is the City of Little Rock

1    ready?

2              MR. MANN:  Yes, Your Honor.

3              THE COURT:  All right.  Ms. Tyree, would you call 18

4    jurors?

5              THE COURTROOM DEPUTY:  John Johnston.  Loretta Miller.

6    Regan Humphries.  Robbie Gilson.  James Bennett Jr.  Mary

7    Freeman.  Ruth Binford.  James Burgess.  Sherry Miller.

8              PROSPECTIVE JUROR SHERRYL MILLER:  That's Sherryl

9    Miller.

10             THE COURTROOM DEPUTY:  That's Sherry Miller.

11             PROSPECTIVE JUROR SHERRYL MILLER:  S-h-e-r-r-y-l?

12             THE COURTROOM DEPUTY:  S-h-e-r-r-y.  Maybe they have

13   it misspelled.

14             THE COURT:  Maybe we have a misspelling.  Hold on just

15   a minute, Ms. Miller.  Make sure this is you.

16             THE COURTROOM DEPUTY:  They have it misspelled.  It's

17   Sherryl.

18             THE COURT:  You can come take your seat.

19             THE COURTROOM DEPUTY:  Kristina Dunn.  Shannon Bailey.

20   Samuel Grubb.  Jennifer Caton.  Patricia Hotle.  Timothy

21   Wachtstetter.  Mickey Johnson.  Jenna Sue Holladay.  Frances

22   Cooper.

23        That's 18, Your Honor.

24             THE COURT:  Okay.  Where is Ms. Brooke Smith?  Can you

25   come down, please?

1      Mr. Mann, would you and Ms. Benedicto come down too?

2      (Bench conference reported as follows:)

3          THE COURT:  Ms. Brooke Smith has to pump and she needs

4    to be able to take breaks to allow her to do it.  We have 18 in

5    the box and we have, I think, 10 left over without Ms. Brooke

6    Smith.  If you want me to keep her here just in case we need

7    her, I will.  And I don't know what these jurors are going to

8    say.  But I'm probably going to let her go at some point unless

9    we just have to have her.  So what I'm going to do is -- what I

10   would like to do is make her hang around a little while, and if

11   it looks like we're not losing a bunch of jurors, I'm going to

12   let her go.

13         MS. BENEDICTO:  Okay.

14         THE COURT:  If it turns out that we start losing a

15   bunch of jurors, I'm going to hang on to you, Ms. Brooke Smith.

16         PROSPECTIVE JUROR SMITH:  Okay.

17         THE COURT:  Just cross your fingers.  It may be we

18   don't need you.  Okay?

19         PROSPECTIVE JUROR SMITH:  Okay.

20         THE COURT:  Does anybody have any objection to that?

21         MR. MANN:  No, sir.

22         MS. BENEDICTO:  No, sir.

23      (Proceedings continuing in open court as follows:)

24         THE COURT:  All right.  Ladies and gentlemen, as I

25   told you when we first got started, we're going to start a

1    lawsuit today.  It's a civil case.  It's a case in which Ericka

2    Benedicto is suing the City of Little Rock.

3        I'm going to tell you a little bit -- and although I'm

4    speaking to the 18 we've called, I want those of you who were

5    not called to listen as well because if you have any answers

6    that you want to give to any of the questions I ask, I want you

7    to raise your hands.  And it may be that we can determine that

8    one or two of you may not be good for this case.  And if it's

9    readily apparent very early on, we will deal with that early.

10       Like I said, this is a civil case.  A civil case -- there

11   are two types of cases that come to trial.  One, you have

12   criminal cases where the government is bringing charges,

13   criminal charges, against somebody.  And in such a circumstance

14   you would have the U.S. Attorney here.  In the state court, you

15   would have a prosecutor there who is trying to prove the case

16   against the defendant beyond a reasonable doubt.  And the

17   consequence of being found guilty in a criminal case is you

18   could go to jail or you could have to pay a fine.

19       Then you have civil cases where one person disagrees with

20   something another person has done and files a lawsuit.  And in

21   those cases, normally what the person is seeking is some type

22   of money damages or a declaration that the other side has to do

23   something.  And that's what we have here.

24       In a case like this -- and we'll get into it a little more

25   deeply a little later -- what we try to do is we try to find

1    jurors who can come in and listen to the case and be fair to

2    both sides, listen to the facts of the case, and render a

3    verdict based on the information you hear from the witness

4    stand.  The only evidence you will hear in a case like this

5    will come from the witness stand, from the people who have

6    sworn to tell the truth and they testify.

7           And this case is a little different.  In this case we have

8    a plaintiff, Ms. Benedicto, who is representing herself.  And

9    so we call that pro se, but all that means is she's

10   representing herself.  And so there will be circumstances when

11   Ms. Benedicto is making an argument to you or is talking to you

12   in opening statements and stuff like a lawyer would normally

13   do, and in those circumstances she's not testifying.  And so

14   those statements are just argument.  But when Ms. Benedicto

15   comes and sits on the witness stand and swears to tell the

16   truth, the whole truth, and nothing but the truth, so help her

17   God, she then -- you know, you judge her testimony just like

18   it's testimony of any other witness in the case.  You

19   understand?  And so you'll be called on to do something a

20   little different than what I normally tell jurors to do.

21   Normally I tell them, "Nothing you hear from lawyers is

22   evidence.  Nothing you hear from these people who are standing

23   out here is evidence" because it's true.  Nothing I tell you is

24   evidence.  But you'll have to kind of determine when Ms.

25   Benedicto is testifying as compared to when she's making

1    argument.  And so just remember -- can all of you do that?  Can

2    you keep that straight?  When she's talking to you, as almost

3    like a lawyer for herself, that's not testimony, but when she

4    testifies, it is.

5        All right.  Now, let me tell you what we're going to do.

6    We're going to now engage in the jury selection process.  And

7    just so you have some idea of why we do this and why we even

8    called you in here this morning, I usually take two people and

9    make examples out of them.  And it's just easy to take

10   Mr. Johnston and Ms. Miller because they are the first two

11   people called.  And it's easy, kind of explains to you the

12   process we have and why we're here and why what you're doing is

13   so important.

14       Okay.  Let's use them as an example.  Say, Mr. Johnston

15   and Ms. Miller have a dispute.  And Mr. Johnston disagrees with

16   something Ms. Miller did and he is upset and he gets with her,

17   and she says, "Look.  I didn't do anything wrong.  I've not

18   violated any contract.  I've not violated anything.  So go

19   pound sand.  You know, don't come to me with that."

20       At that point Mr. Johnston has a choice to make.  He can

21   either just let it go, or he can decide to take his case to the

22   courtroom, right?  Now, what we would advise people to do is

23   don't go out and pick up a gun and go over to Ms. Miller's

24   house and try to resolve it that way.  What we would ask you to

25   do is, either go get a lawyer or yourself, and what Ms.

1    Benedicto has done, go down and file a lawsuit.  And then we'll

2    bring it to this courtroom and we'll let 12 people decide who

3    is right.

4          Now, if Mr. Johnston decides he's not going to get a

5    lawyer, he's going to handle it himself the way Ms. Benedicto

6    has done, what would he file with the clerk's office to get his

7    case started to start the case?  Does anybody know what that

8    document is called that he will file with the clerk to just

9    begin a lawsuit?

10                PROSPECTIVE JUROR:  Petition.

11                THE COURT:  Someone said a petition.  In certain cases

12    it is a petition, but not in a case like this.  What would it

13    be?  It's called a complaint.  And think about the term

14    "complaint."  That's very -- I don't know -- technical, isn't

15    it, to say, "I'm complaining against you."  And in that

16    complaint -- it's not very technical at all.  It's very

17    obvious.  What Mr. Johnston would do, he would file a document

18    with the clerk's office that says, "I am suing Ms. Miller and

19    here's the reason why, and here's what she did, and here's what

20    I'm asking for," the type of remedy he's asking for.

21          Now, in response, what would Ms. Miller file?  Does

22    anybody know?

23                PROSPECTIVE JUROR:  An answer.

24                THE COURT:  An answer.  Very good.  You would be

25    surprised at how many people just don't know that.  And why

1    would you know it?  You know, you're not lawyers and you don't
2    deal with this stuff all the time.  But really it's that
3    simple, the response is an answer.  And in that response what
4    Ms. Miller would say is, either I agree with certain things, I
5    agree that my name is Ms. Miller, I agree that we had an
6    agreement, I agree that we worked together, whatever it was,
7    but I disagree with these things.  Because if she agrees with
8    everything that Mr. Johnston says, the case is over, right?
9    There's no reason to go to court.

10        But in some cases we have where a defendant will agree
11   with everything the plaintiff says, but says, "You're not
12   entitled to money for that."  Right?

13        So in this case, let's just say that Ms. Miller says, "I
14   disagree with some of the things you're saying I did, and,
15   therefore, you know, we're just going to have to put it to a
16   jury."

17        Now, what happens at that point?  Normally what happens is
18   each side gets to ask the other side questions.  You know,
19   Mr. Johnston would send over what we call interrogatories, and
20   all that means is questions.  He'll ask Ms. Miller certain
21   questions like this, "Who are your witnesses going to be?  What
22   is your defense going to be?"

23        "You know, I'm claiming that I owe you a certain amount of
24   money.  You claim that I don't.  What is that based on," those
25   types of questions. [sic]

1      Ms. Miller will ask the same thing, "You claim that I did

2  this.  What is that based on?  You claim that I owe money.

3  Give me a calculation for what you believe I owe you," those

4  type -- "Who are your witnesses?  Where do they live?  How can

5  I contact them?"

6      Once all that is done where each side knows what the

7  claims are, what the defenses are, and what -- who the

8  witnesses are, then you have a chance to go out and talk to the

9  witnesses, right?  You can go talk to them.  And in certain

10  circumstances, you'll take what are called depositions.  And I

11  don't know if we have depositions in this case.  Do we?

12          MR. MANN:  Yes, Your Honor, we have one.

13          THE COURT:  Okay.  So here's what happens in a

14  deposition.  Say, Ms. -- Mr. Miller -- I mean, Mr. Johnston,

15  there's a witness that Ms. Miller has that he wants to make

16  sure he captures.  What he'll do is he'll set a deposition date

17  and he'll go out with his lawyer -- well, he doesn't have a

18  lawyer, he's doing it himself.  He'll go out just like he is a

19  lawyer.  Ms. Miller will have her lawyer there.  And you'll sit

20  down just like you're in a courtroom.  You'll have a court

21  reporter who puts the witness under oath.  And then you start

22  asking questions just like you're in the courtroom.

23      Now, what is the benefit of doing that?  There are a

24  number of benefits, but depositions are used in a number of

25  ways.  Say, if the witness cannot show up for court, either is

1    out -- is a thousand miles away and can't be here, then

2    Mr. Miller -- I mean, Mr. Johnston would then be able to come

3    in here under certain circumstances and read that deposition

4    into the record to the jury just as though the witness is here.

5    Because in that circumstance, Ms. Miller had an opportunity to

6    cross-examine the witness, to ask the witness questions

7    herself, just like she was in a courtroom, so that testimony is

8    just like courtroom testimony.

9         But there's another way that we use depositions.  What if

10   the witness comes and sits on the witness stand and says

11   something a little different than what the witness said during

12   the deposition?  Then what will happen is Mr. Miller will get

13   up and say, "Well, Ms. Crabtree, you testified at a deposition

14   this way.  Didn't you say this?"  "Yes, I did."  "And now

15   you're saying something different."  So you can be

16   cross-examined with that testimony.

17        And so once all of the depositions get taken and all of

18   the discovery is done, then we come to the courtroom.  And what

19   do we do in a courtroom?  We go out and we find -- we try to

20   find 12 people who will come from different backgrounds, who

21   would view the world differently, different upbringings,

22   different views on things, and we bring them in here, as long

23   as you don't -- you qualify.  And what that means is you don't

24   know the parties to the case, you don't have any reason for

25   believing one way or the other before we get started, and you

1    can just be fair.  We try to pick -- essentially what we're

2    trying to do is pick 12 fair people who have nothing to gain or

3    lose by making a decision in this case, and we try to find them

4    to sit here and listen to the case put on by the two people

5    disputing.  And why do we do that?  We do that because you have

6    people like me who are judges, I'm appointed for life.  Do you

7    really want a judge appointed for life making all the decisions

8    about disputes that common citizens have every day?  I would

9    say no.  I think that the better way to do it is to pick 12

10    people, instead of having one person from one background who is

11    essentially a political appointee, although we're not supposed

12    to be political people -- no.  Really.  I was appointed by

13    President Bush, the Senate, which was a democratic Senate,

14    confirmed me.  But, you know, you can look at it and say, "He

15    views the world a certain way," right?  Wouldn't you rather

16    have 12 people from 12 different backgrounds come in here with

17    all of your common sense and listen to what the people have to

18    say, look at the evidence, go back to the back, talk it over,

19    and come out with a unanimous verdict?  Doesn't that seem to be

20    stronger than just the ideas of one person?  I think so.  And

21    so that's what we do.

22        And so the reason we have you here this morning, why we've

23    taken you away from your jobs, your families, and everything

24    else, and your homes, is so you can come down here and listen

25    to the dispute that these people have and determine what

1    happened.  Can all of you do that?

2         Is there some reason -- you know, like, every now and

3    again I'll have people who tell me, "You know, I have

4    manic-depression," or, "I have something that prevents me from

5    thinking straight," or whatever.  Is there anybody here -- and

6    not that you want to raise your hand on something like that,

7    but if you want to bring it to the bench, you can.  Is there

8    anybody here who says -- because I've had people who say, "I

9    just don't think straight."  I've literally had people say

10   that.  I tend to believe those are usually the people with the

11   most common sense.  But is there anybody here who, before we

12   even get started, says, "I just can't do this?"  Good.  And

13   this case will only last a couple of days.  It's not going to

14   last weeks and weeks and weeks, and so it's not something

15   that's going to be that intrusive.

16        Now, like I told you, the only evidence you're going to

17   hear in this case is going to come from the witness stand.

18   Nothing I say is evidence, but what I did was I prepared a very

19   quick statement of what I believe the case is about.  Like I

20   said, this is not evidence in any way, but it's just my very

21   high-level statement of what the case is about.

22        In this case, the plaintiff, Ericka Benedicto, is suing

23   her employer, the City of Little Rock, alleging that it

24   discriminated against her by denying her a salary increase

25   because of her race.  Ms. Benedicto is seeking compensatory

1    damages.  The City of Little Rock denies this claim and denies

2    owing damages to Ms. Benedicto.  And that's the case.

3         Now, is there anybody, before we even get started, who

4    says, "I cannot listen to that type of case"?  And we'll dig a

5    little deeper into who has had these types of claims made

6    against you or whether you've made these types of claims or

7    anything like that in the past.  But before we even get

8    started, is there anybody who cannot sit here and be fair and

9    just listen to the case and make a decision based on the facts

10   of this case?

11        All right.  Now, before we go any further, Ms. Benedicto,

12   would you rise, please?

13             MS. BENEDICTO:  Yes, Your Honor.

14             THE COURT:  And this is Ericka Benedicto.  Would you

15   introduce yourself to the jury?

16             MS. BENEDICTO:  Yes.

17             THE COURT:  And let the jury back there see you also.

18             MS. BENEDICTO:  Yes, Your Honor.

19        Good morning.  I'm Ericka Benedicto.  As Judge Miller

20   indicated, I'm representing myself pro se.  I work for the City

21   of Little Rock as a diversity program manager.  And I reside

22   here in Little Rock.  So, again, I'm Ericka Benedicto, I'm

23   diversity program manager for the City of Little Rock.

24             THE COURT:  Now, does anybody here know Ms. Benedicto?

25   Have any of you in any of your dealings with the City of Little

1    Rock crossed paths with her?  Have you -- do you know of her in
2    any way at all?
3         Okay.  Thank you.
4         And, Mr. Mann, would you rise and introduce your client to
5    us?
6              MR. MANN:  Yes, Your Honor.
7              THE COURT:  Introduce yourself too.  I'm sorry.
8    Introduce yourself and your client.
9              MR. MANN:  I'm Bill Mann.  I work for the Little Rock
10   City Attorney's Office.  And I live here in Little Rock.  I
11   represent the City of Little Rock today in this lawsuit.  And
12   as the City, like a company, I can't bring the whole place in
13   here to sit at counsel table with me to be a representative, so
14   my representative here today is Ms. Pamela Wrather.
15        Pam, would you mind standing?
16        Pam is the classifications manager with our human
17   resources department.  And she'll be here today -- she'll be
18   with me throughout the trial.
19             THE COURT:  Thank you.
20             MR. MANN:  Thank you, Your Honor.
21             THE COURT:  Now, does anybody here know Mr. Mann or
22   Ms. Wrather?
23        Yes, ma'am.
24             PROSPECTIVE JUROR WOODWARD:  I'm wearing hearing aids
25   and I can't hear a thing they are saying.

1          THE COURT:  Have you heard -- have you heard anything

2    I said so far?

3          PROSPECTIVE JUROR WOODWARD:  Yes, because you're on

4    the microphone.

5          THE COURT:  I understand.  We'll do better.

6        Ma'am, what is your name?

7          PROSPECTIVE JUROR WOODWARD:  Darlene Woodward.

8          THE COURT:  Ms. Woodward, Ms. Benedicto is the

9    plaintiff in the case.  She's the one bringing the lawsuit.

10   Mr. Mann is representing the City of Little Rock, the

11   defendant.  Ms. Wrather is in the human resources department,

12   the classifications specialist with the City of Little Rock.

13   And the question I was asking is, have you ever come in contact

14   with these folks?  Do you know them in any way?

15         PROSPECTIVE JUROR WOODWARD:  No.

16         THE COURT:  Okay.  Now, something very obvious in the

17   room is that the defendant in the case is the City of Little

18   Rock, right?  Now, I'm sure all of you have heard of the City

19   of Little Rock as we sit here in the city of Little Rock,

20   right?  Okay.  Before we even get started -- I'm from Helena.

21   And if you ask the people in Helena anything about the City of

22   Helena, meaning city council, city hall, mayor, all of that

23   type stuff, the first thing you'll get is a bunch of

24   complaining and moaning, right?  Before we even get started,

25   when I say the City of Little Rock is the defendant, is there

1  anybody here who immediately has either a negative or positive
2  thought?  Anybody here who, before we even get started, would
3  say, "Man, I've dealt with the City of Little Rock, and if
4  she's suing them because they messed up something or did
5  something wrong, I believe it before we even get started"?
6      Anybody here say, "You know, all my -- I live in the city,
7  I've lived here my whole life.  I love Little Rock.  And before
8  we even get started, if she's suing the City of Little Rock,
9  she's just wrong?  I just don't think this could ever happen,"
10  before you even hear the facts?  Okay.
11      Anybody here, simply because the City of Little Rock is
12  involved, would that influence your view of the case at all
13  positively or negatively?
14      Now, when I read the statement of the case, it's very
15  clear that this is a race discrimination case.  Is there
16  anybody, before we even dig into that at all, who is
17  uncomfortable making a ruling in a race discrimination case?
18  You know, there are certain people who feel like, you know,
19  "Racism is still with us, and, man, I just think it probably
20  happened," before they even hear anything?  Anybody have that
21  view?
22      On the other side, there are people who say, "Racism is a
23  thing of the past.  And I just can't see this having happened,"
24  before you ever and -- before you ever hear any evidence?
25      Any of you look at the fact that Ms. Wrather is a black

1    woman and she's in the human resources department and

2    immediately say, "Well, no, she wouldn't discriminate against

3    Ms. Benedicto because Ms. Wrather is black"?  You have to say

4    there's a little bit of you that would say that, right?  Right?

5    I mean, it's okay to think that, right?  But understand that

6    you have to make a decision based on the testimony that you

7    will hear later.  Can all of you do that?  Anybody who just

8    looking at this case, before we even get started, who can't do

9    that?  Okay.

10        Ms. Benedicto, would you rise and read to us who your

11   witnesses are who you may call?

12        MS. BENEDICTO:  Yes.  I have City Manager Bruce Moore

13   as a witness that I may call, Susan Langley --

14        PROSPECTIVE JUROR WOODWARD:  Can't hear a thing.

15        MS. BENEDICTO:  Sorry.  I'll say that again.  I have

16   on my witness list Bruce Moore as a potential witness, Susan

17   Langley, Margaret "Meg" Matthews, Pamela Wrather, Stacey

18   Witherell.

19        THE COURT:  Are those your witnesses?

20        MS. BENEDICTO:  Yes, Your Honor.

21        THE COURT:  Is there anybody here who recognized any

22   of the names that Ms. Benedicto just called?

23        COURT SECURITY OFFICER:  She's having trouble hearing.

24        THE COURT:  I think we're going to have to let her go.

25        Ma'am, what's your name again?

1          PROSPECTIVE JUROR WOODWARD:  Darlene Woodward.

2          THE COURT:  Ms. Woodward, I'm going to have to let you

3    go because I think during the course of the trial it would be

4    very difficult to make sure everyone is in front of a mic

5    speaking very clearly.

6          Does anybody have an objection?  I just think it would be

7    very difficult.

8          MR. MANN:  No objection, Your Honor.

9          MS. BENEDICTO:  No objection.

10          THE COURT:  Okay.  Now, is there anybody here who

11    recognized any of those names?

12          Okay.  Mr. Mann, would you rise and tell us who your

13    witnesses may be?

14          MR. MANN:  Yes, Your Honor.  Basically the same

15    witnesses as Ms. Benedicto just read, but I'll read them again:

16    Bruce Moore, Pamela Wrather, Stacey Witherell, Susan Langley,

17    Meg Matthews, and Bryan Day.

18          THE COURT:  Any of you recognize any of those names?

19          Yes, ma'am.  Tell us your name first.

20          PROSPECTIVE JUROR SHERRYL MILLER:  Sherryl Miller.

21          THE COURT:  Yes, ma'am.

22          PROSPECTIVE JUROR SHERRYL MILLER:  For full disclosure

23    to the Court and to your attorneys, I have been the audit

24    manager over component units of the City of Little Rock, never

25    with the City itself, but the component unit.  So obviously

1    Bruce Moore's name is familiar to me as well as Mr. Day.

2           THE COURT:  That's good.  Tell us, have you worked

3    with Mr. Moore?

4           PROSPECTIVE JUROR SHERRYL MILLER:  I have not.

5           THE COURT:  Even though you know some of the names --

6    what was the other name?

7           PROSPECTIVE JUROR SHERRYL MILLER:  I know the names.

8    Again, I only have audited or been the audit manager over

9    component units.

10          THE COURT:  And, Ms. Miller, who do you work with?

11          PROSPECTIVE JUROR SHERRYL MILLER:  I am now retired.

12          THE COURT:  Who did you work with?

13          PROSPECTIVE JUROR SHERRYL MILLER:  L. Cotton Thomas

14   and Company.

15          THE COURT:  I was going to ask you the next question,

16   would rendering a verdict in this case against the City in any

17   way jeopardize your business with the City, but you say

18   you're retired.  You don't care.

19          PROSPECTIVE JUROR SHERRYL MILLER:  I'm retired.  I

20   retired last June.

21          THE COURT:  Okay.  Let me ask you this.  Do you feel

22   comfortable sitting as a juror in a case in which the City of

23   Little Rock is involved?

24          PROSPECTIVE JUROR SHERRYL MILLER:  I have no problem

25   with doing so.

1          THE COURT:  Okay.  And you don't know any of the other

2    witnesses?

3          PROSPECTIVE JUROR SHERRYL MILLER:  I do not know any

4    of the other witnesses.

5          THE COURT:  Anybody else know any of those names?  Has

6    anybody heard the name Bruce Moore before?  He's the city

7    manager, right?  Isn't he the city manager?

8          MR. MANN:  Yes, Your Honor.

9          THE COURT:  Anybody ever heard that name?

10     Okay.  And let me ask first, Ms. Dunn, you said that

11   you've heard the name Bruce Moore before?

12          PROSPECTIVE JUROR DUNN:  (Nodding head.)  Just because

13   I read the paper.

14          THE COURT:  Anything about having read the paper and

15   read his name that would make you lean one way or the other in

16   this case?

17          PROSPECTIVE JUROR DUNN:  No.

18          THE COURT:  And, Mr. Grubb, same question.  How do you

19   know Mr. Moore or know the name?

20          PROSPECTIVE JUROR GRUBB:  Paper.  I've worked with a

21   group called Create Little Rock, which has worked on City

22   projects.  It's a nonprofit group that they've worked on

23   remaking blocks and stuff like that.  So I've heard him in, you

24   know, conjunction with them talking about it.  And I also

25   worked for the Central Arkansas Library System, so I've heard

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1       it in conjunction with stuff going on with that.

2               THE COURT:  And do you know him at all?

3               PROSPECTIVE JUROR GRUBB:  No.

4               THE COURT:  Anything about what you know about

5       Mr. Moore that would make you lean one way or the other?

6               PROSPECTIVE JUROR GRUBB:  No.

7               THE COURT:  And you have done work with the City

8       through your nonprofit and you've worked for the library.  Is

9       there anything about those relationships and what you do that

10      would make it difficult for you to listen to a case in which

11      the City of Little Rock is a defendant?

12              PROSPECTIVE JUROR GRUBB:  No, I don't think so.

13              THE COURT:  Here's the reason why I ask.  It may be

14      that you could be as fair as they come, but if ever you felt

15      like you would have to explain your verdict to anybody, it

16      would be better for you not to be on the jury.  And only you

17      can make that decision.  And we don't need to deal with it now,

18      but think it through.  If ever you get to the point during this

19      process that you think, well, somebody might ask me why did I

20      do X, Y, or Z, and I just wouldn't want that to be in your mind

21      at all as you sit here as a juror.  Do you understand?

22              PROSPECTIVE JUROR GRUBB:  Yes.

23              THE COURT:  Anyone else do work for the City of Little

24      Rock or have ever done work for the City of Little Rock?  Any

25      other juror?  Okay.  So nobody here has ever done business with

1    the City.

2         Anybody here ever have a dispute with the City over

3    anything?  It could be anything from a zoning issue, to them

4    not picking up your garbage, to anything.  Anybody here?  Oh,

5    wow.  The City of Little Rock -- okay.  Almost never do I have

6    a full panel of jurors who say that.  Usually somebody says,

7    "Yeah, we had an issue about something."  But never, nobody?

8         Okay.  Now, anybody here ever serve as a juror before?

9    Okay.  And we're not going to go through all of that, but I'll

10   just ask those in the first 18.

11        Mr. Johnston, what type of jury did you serve on?

12             PROSPECTIVE JUROR JOHNSTON:  Saline County court.

13             THE COURT:  And what type of case was it?

14             PROSPECTIVE JUROR JOHNSTON:  It was basically just

15   trying to establish a sentence for a DWI case.

16             THE COURT:  So it was a criminal case?

17             PROSPECTIVE JUROR JOHNSTON:  Yes.

18             THE COURT:  And in that case it was -- the standard is

19   beyond a reasonable doubt, right?

20             PROSPECTIVE JUROR JOHNSTON:  Yes.  He was already

21   pronounced guilty.  We were just the sentencing trial.

22             THE COURT:  Okay.  Sentencing jury.  I understand.  So

23   you didn't even have to deal with the standard of proof.  You

24   just had to decide what the sentence would be?

25             PROSPECTIVE JUROR JOHNSTON:  Yes.

1    THE COURT:  Anything about that experience that would

2    make it difficult for you to serve as a juror here?

3    PROSPECTIVE JUROR JOHNSTON:  No.

4    THE COURT:  Who else do we have?

5    Yes, sir.  What's your name?

6    PROSPECTIVE JUROR BENNETT:  James Bennett.

7    THE COURT:  Mr. Bennett, what type of jury did you sit

8    on?

9    PROSPECTIVE JUROR BENNETT:  Sat on a civil trial in

10   Oklahoma City.

11   THE COURT:  Okay.  And so you're familiar with the

12   standard in a civil case?

13   PROSPECTIVE JUROR BENNETT:  Yes, sir.

14   THE COURT:  By a preponderance of the evidence?

15   PROSPECTIVE JUROR BENNETT:  Yes, sir.

16   THE COURT:  Many of you may not have followed the

17   whole Tom Brady/NFL situation where they kept talking about

18   more likely than not and that's not a good enough standard.

19   Well, that is the standard in a civil case, more likely than

20   not.  It's by a preponderance of the evidence.  It means if you

21   tip the scale ever so slightly, you prove it, right?

22   Is there anybody here who has, before we even get started,

23   a problem with that standard, who thinks that a plaintiff who

24   brings a case should have to prove it beyond a reasonable doubt

25   instead of by a preponderance of the evidence?

1           And I know you might not really understand those terms.

2     Just understand, beyond a reasonable doubt is a much higher

3     standard.  And why is that in a criminal case?  Do you

4     understand?  Because if I'm going to put you in jail, I'd

5     better prove it a lot more clearly than if I'm just suing you

6     for money.  Do you understand that?  Okay.  And in a criminal

7     case, it's the government who is bringing the case against you.

8     And so it's a little different than two common citizens

9     involved in a lawsuit.

10          Who else did we have on the front row?

11          Yes, sir.  What's your name?

12               PROSPECTIVE JUROR BURGESS:  James Burgess.

13               THE COURT:  Mr. Burgess, what type of case was it?

14               PROSPECTIVE JUROR BURGESS:  Federal court criminal

15    case about 30 years ago, and then a civil case in Faulkner

16    County.

17               THE COURT:  And so you've experienced both criminal

18    and civil.  Any problems with those trials that would make it

19    difficult for you to serve here?

20               PROSPECTIVE JUROR BURGESS:  No, sir.

21               THE COURT:  Your experience a pretty good experience?

22               PROSPECTIVE JUROR BURGESS:  Yes.

23               THE COURT:  Okay.  That's always good to hear.

24          Back row who do we have who has served on a jury before?

25          Yes, ma'am.  What's your name?

1          PROSPECTIVE JUROR HOTLE:  Patricia Hotle.

2          THE COURT:  Ms. Hotle, what type of trial was it?

3          PROSPECTIVE JUROR HOTLE:  It was civil.

4          THE COURT:  And how long ago was that?

5          PROSPECTIVE JUROR HOTLE:  About four years ago.

6          THE COURT:  So you're familiar with the standard of

7     proof or the standard?

8          PROSPECTIVE JUROR HOTLE:  Uh-huh.

9          THE COURT:  Did you have any problems in that case

10    that would make it difficult for you to serve here?

11         PROSPECTIVE JUROR HOTLE:  No.

12         THE COURT:  Anybody else on the back row?

13       Yes.

14         PROSPECTIVE JUROR COOPER:  Frances Cooper.  I served

15    in Chicago in a civil case.

16         THE COURT:  How long ago was that?

17         PROSPECTIVE JUROR COOPER:  30 years ago.

18         THE COURT:  So you're familiar with the standard of

19    proof?

20         PROSPECTIVE JUROR COOPER:  Yes.

21         THE COURT:  Any problems serving on a jury in Chicago

22    that would make it difficult for you to serve here?

23         PROSPECTIVE JUROR COOPER:  No.

24         THE COURT:  Did all of you who have served as jurors

25    have decent experiences?  Anybody have a bad experience?

1        And out here, anybody have a bad experience?

2        Okay.  And I ask that question because every now and

3   again -- well, I haven't had it as a judge, but when I was

4   prosecuting years ago, every now and again I would get a juror

5   who didn't want to serve because of a bad experience.  You

6   know, they'd say that they just didn't like what happened in

7   the jury room.  Anybody have an experience like that?  Okay.

8        Who here believes there are too many lawsuits?  Anybody

9   here thinks there are too many lawsuits?  It's okay.  You know,

10  if I didn't do it for a living, if it didn't pay my mortgage, I

11  would say the same thing.  You know, this is what I do for a

12  living, right?

13       And, sir, what's your name?

14            PROSPECTIVE JUROR POWELL:  Keith Powell.

15            THE COURT:  Mr. Powell, why do you think there are too

16  many lawsuits?

17            PROSPECTIVE JUROR POWELL:  I just do.

18            THE COURT:  Okay.  And that's a good enough answer.

19       Anybody else?

20       You know, you read about lawsuits all the time and you

21  hear all of these things about, you know, cups of coffee

22  falling in laps and stuff like that.  And some of the lawsuits

23  you hear do make you think how could that happen, right?  But

24  do you understand that regardless of what your thoughts are

25  about lawsuits, that's not what this case is about?  That you

1    could dislike lawsuits every day and you could say, "Hey, there

2    are too many of them," right?  But when it comes down to this

3    lawsuit, your only job is to listen to the facts that you hear

4    and make a decision based on the case we have here today.  Is

5    there anybody who just can't do that?

6         Now, sir, give me your name again.

7              PROSPECTIVE JUROR POWELL:  Keith Powell.

8              THE COURT:  Now, Mr. Powell, you're not in the 18, but

9    if you ended up on the 18, could you do that?  The question I

10   asked was, even though you might think there are too many

11   lawsuits, do you understand that if you sit on this jury,

12   that's not what this case is about?  It's not about there being

13   too many lawsuits, theoretically.  It's about what happened

14   here.  So the only job of a jury is to decide what happened in

15   this case.  And the question then was, could you do that?

16             PROSPECTIVE JUROR POWELL:  Yes.

17             THE COURT:  Okay.  Like I said, this case is going

18   to -- well, let me go back.  Anybody here ever been sued?

19   Anybody here -- I'm going to ask everybody about this.  Anybody

20   here in addition to those who have been sued ever have a family

21   member or somebody close to you who has been sued?

22        And let's go down the front row.  Sued or have family

23   members who have been sued.

24        Yes, ma'am, over here, you raised your hand.  What's your

25   name?

1          PROSPECTIVE JUROR BINFORD:  Ruth Binford.

2          THE COURT:  And, Ms. Binford, how long ago was that?

3          PROSPECTIVE JUROR BINFORD:  '98 and 2006.

4          THE COURT:  Okay.  And anything about that that

5   would -- and how did those cases resolve?  Let me ask that

6   first.

7          PROSPECTIVE JUROR BINFORD:  The first one was small

8   claims court and it was dismissed.  It was found in our favor.

9   The second one was settled before it went to trial.

10          THE COURT:  Anything about those experiences that

11  would make you, before we even get started, lean one way or the

12  other?

13          PROSPECTIVE JUROR BINFORD:  No.

14          THE COURT:  Anything about the fact that you settled

15  one of your cases that would say the City of Little Rock should

16  have settled this case?

17          PROSPECTIVE JUROR BINFORD:  No.

18          THE COURT:  Anything about the fact that you settled

19  the one case that would say to you, well, if Ms. Benedicto had

20  a good case, they would have settled it already?

21          PROSPECTIVE JUROR BINFORD:  No.

22          THE COURT:  You understand that both of these parties

23  have a right to come in here and let the jury determine?

24          PROSPECTIVE JUROR BINFORD:  Yes.

25          THE COURT:  Back row.  Yes, ma'am.

1        PROSPECTIVE JUROR DUNN:  In process.

2        THE COURT:  So you're being sued right now?

3        PROSPECTIVE JUROR DUNN:  Yeah.

4        THE COURT:  Let me ask -- give us your name again.

5        PROSPECTIVE JUROR DUNN:  Kristy Dunn.

6        THE COURT:  And, Ms. Dunn, anything about that that

7    would weigh on your mind as you're listening to the facts of

8    this case?

9        PROSPECTIVE JUROR DUNN:  Perhaps.

10        THE COURT:  Okay.  And -- yeah.  I don't think I've

11    ever had a juror who was actively being sued.  I've had those

12    who have had, like, car accident cases that were being resolved

13    or something, but they weren't actively being sued.  And I

14    don't want to get into the facts of your case.  You look like

15    you don't mind telling it.

16        PROSPECTIVE JUROR DUNN:  I don't mind.

17        THE COURT:  Yeah, tell us what --

18        PROSPECTIVE JUROR DUNN:  I'm a first year Catholic

19    school principal, and I'm being sued in addition to the insurer

20    and the school and every member above that was in the previous

21    administration.  And it's a slip-and-fall case in our school,

22    which we hate happened, but it did happen almost three or four

23    years ago.

24        THE COURT:  And so you're one of the named people --

25        PROSPECTIVE JUROR DUNN:  Correct.

1          THE COURT:  -- who just substituted for those who were

2     sued initially?

3          PROSPECTIVE JUROR DUNN:  Correct.  So I have a

4     heightened sensitivity to that, to be 100 percent honest.

5          THE COURT:  Okay.  And do you think that is something

6     you could clear from your mind as you sit here and listen to

7     this case, being honest?

8          PROSPECTIVE JUROR DUNN:  Being honest, I would love to

9     say that I could, but I'm not sure that I can.

10          THE COURT:  Ms. Dunn, I'm going to let you go.  I just

11     think it would be hard for you to be actively being sued and

12     being here and try to be fair.  So thank you.  What I would say

13     to you is, you are excused until further notice, and thank you.

14          PROSPECTIVE JUROR DUNN:  Thank you.

15          THE COURT:  Call me another juror, Ms. Tyree.

16          THE COURTROOM DEPUTY:  Keith Powell.

17          THE COURT:  Just come around, Mr. Powell.  I think you

18     can come around and come up the back way.

19       Now, Mr. Powell, other than the question about lawsuits,

20     is there anything else that you would have answered had you

21     been seated here?

22          PROSPECTIVE JUROR POWELL:  No, sir.

23          THE COURT:  Okay.  And I'll be -- normally I get a

24     bunch of people who say there are too many lawsuits.  Normally

25     I get more than just one.  And I end up with those people on

1    juries a lot of times.  And people normally, you know, if you

2    say, "Can you just judge this case based on the facts of this

3    case," they do it.  But we have to ask those questions because

4    we have to get it on the record and at least give the parties a

5    chance to talk to you about that.

6         We had somebody else.  Ever been sued or been sued? [sic]

7         Yes, ma'am.

8              PROSPECTIVE JUROR HOTLE:  My brother was sued.

9              THE COURT:  And how long ago was that?

10             PROSPECTIVE JUROR HOTLE:  Maybe 15 years ago.

11             THE COURT:  Anything about that that would weigh on

12   your mind as we go through this case?

13             PROSPECTIVE JUROR HOTLE:  No.

14             THE COURT:  Okay.  Was it resolved ultimately one way

15   or the other?

16             PROSPECTIVE JUROR HOTLE:  Yes.

17             THE COURT:  And who else?  Anybody else?

18        Anybody out here ever been sued?

19        Yes, ma'am.  What's your name?

20             PROSPECTIVE JUROR DOEPEL:  Vera Doepel.

21             THE COURT:  Give it to us again, please.

22             PROSPECTIVE JUROR DOEPEL:  Vera Doepel.

23             THE COURT:  And, Ms. Doepel, how long ago was that?

24             PROSPECTIVE JUROR DOEPEL:  About 15 years.

25             THE COURT:  Anything about that that would make it

1    difficult for you to be sued -- I mean, not for you to be

2    sued -- for you to serve as a juror here?

3            PROSPECTIVE JUROR DOEPEL:  No, sir.

4            THE COURT:  Okay.  Thank you.

5        Anybody here ever sued anybody?

6        Yes, ma'am.  What's your name?

7            PROSPECTIVE JUROR HUMPHRIES:  Regan Humphries.

8            THE COURT:  Ms. Humphries, how long ago was that?

9            PROSPECTIVE JUROR HUMPHRIES:  13 years ago.

10           THE COURT:  Anything about that that would make it

11   difficult for you to serve here?

12           PROSPECTIVE JUROR HUMPHRIES:  (Shaking head.)

13           THE COURT:  That's a no?  And the reason, I have a

14   court reporter here typing stuff.

15           PROSPECTIVE JUROR HUMPHRIES:  Yes, that's a no.

16           THE COURT:  Okay.  Was that case ultimately -- did it

17   go to trial, or was it resolved before trial?

18           PROSPECTIVE JUROR HUMPHRIES:  It was small claims

19   court, so it was in front of a judge.  We were awarded.

20           THE COURT:  So you took it to the judge and the judge

21   ruled?

22           PROSPECTIVE JUROR HUMPHRIES:  Uh-huh.

23           THE COURT:  Okay.  All right.  Anybody else?

24       Yes, sir.

25           PROSPECTIVE JUROR POWELL:  I think I need to answer

1      yes to that.  Back when I was a teenager, I was in a car wreck

2      and we sued the insurance company for damages.

3                  THE COURT:  Now --

4                  PROSPECTIVE JUROR POWELL:  I was a passenger.

5                  THE COURT:  Mr. Powell, let me say this.  People say,

6      "I sued the insurance company."  Now, you understand the way

7      that works.  You didn't sue the insurance company.  You sued

8      the person, then the insurance company paid for it or --

9                  PROSPECTIVE JUROR POWELL:  Yes.  Okay.

10                 THE COURT:  -- you know, paid for the damages.  And so

11     you were involved in a lawsuit?

12                 PROSPECTIVE JUROR POWELL:  Yes.

13                 THE COURT:  And what happened there?

14                 PROSPECTIVE JUROR POWELL:  I was in a car wreck and

15     had to have surgery, and so we sued for damages and surgery.

16                 THE COURT:  Did you have to go to trial, or was it

17     settled?

18                 PROSPECTIVE JUROR POWELL:  We went to court for that.

19                 THE COURT:  So you actually had to try the case?

20                 PROSPECTIVE JUROR POWELL:  Yes.

21                 THE COURT:  Anything about that that would impact how

22     you view this case?

23                 PROSPECTIVE JUROR POWELL:  No.

24                 THE COURT:  All right.  Anybody else ever been in an

25     accident or had to sue for any reason at all?


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1      Okay.  Let me ask you this.  How many people here have

2  been in positions of authority like management, you know,

3  either you've been a manager or supervisor or anything like

4  that?

5      Okay.  Have any of you ever been accused of being unfair

6  or being -- I don't want to say racist -- but in any way

7  discriminated against anybody in any way, either because it was

8  a woman, because it was a black person, because it was a white

9  person, because -- whatever reason, based on the person's -- I

10  don't know -- religion or anything?  Nobody?

11      Anybody ever been in a position where you thought you were

12  being discriminated against because of your race or because of

13  your sex, because you're a man or a woman?  There's nobody

14  here?

15      Nobody here ever been -- we'll get to you, Mr. Powell.

16          PROSPECTIVE JUROR POWELL:  It's true.  I felt that

17  way.

18          THE COURT:  Hold on a second.  Because I've talked to

19  a lot of people back, you know, in the work force when I've

20  been working over the years and they say, "Man, I've being

21  treated like this because of this," or, "I've been treated like

22  that."  "I think he didn't like me because of that," or, "She

23  didn't like me because of that."  And I'm not saying that you

24  brought a lawsuit, but you just felt like you were being

25  treated differently because you were white?  Because all of you

1    are white.  I don't think I have any black folks.  Or because

2    you're a man or a woman?

3        Okay.  That's what I'm saying.  I've had a lot of people

4    tell me -- look, I've had a lot of white friends of mine say,

5    "Man, I think I got treated differently because, you know, I

6    was the only white guy, and we're talking and doing this," or,

7    "I was the only white woman," or, "I was the only" this.

8    Nobody ever feel like that?

9        Let me go to Mr. Powell and then I'll come to you.

10       Mr. Powell, in your situation, what happened?

11       PROSPECTIVE JUROR POWELL:  Well, it's just a lot of

12   experiences in life really.  I, you know, moved around quite a

13   bit.  And, you know, I guess, early childhood, I was, you know,

14   the only white kid in a black school.  I've been the other way

15   around.  And just a lot of different experiences in life.  You

16   know, people -- you know, different groups treat people

17   differently.  You know, there's a large group -- I mean, it's

18   true.  It's like you say, your friend said they got treated

19   differently because they were different from the crowd.

20       THE COURT:  And let me ask you this.  Would anything

21   about that experience -- because what I'll tell you in my jury

22   instructions is, I'll tell you you don't leave your common

23   sense and your previous experiences at the door.  Now, you have

24   to judge the case based on this case.  But the reason why we

25   have jurors from different backgrounds is because all of you

1   bring your own personal experiences in when you go to the jury
2   room, right?  But you can't come in and substitute your
3   personal experiences for the facts of the case.  So you can't
4   say, "Well, okay.  This happened to me, so I bet you it
5   happened here" even when the facts don't show it.  You
6   understand?
7           PROSPECTIVE JUROR POWELL:  Yes, sir.
8           THE COURT:  Anything about your personal life or
9   personal experiences that would make it difficult for you to
10  sit here and be fair to both sides in this case?
11          PROSPECTIVE JUROR POWELL:  I would say not in
12  particular in the question you're saying, but in experience
13  I've had at work, I've been in a situation where I had a person
14  who sued and had to be deposed because of that particular
15  situation.  And that could potentially --
16          THE COURT:  And you say the person -- they took the
17  deposition of the person?
18          PROSPECTIVE JUROR POWELL:  I was deposed.
19          THE COURT:  You had to give a deposition?  And
20  somebody --
21          PROSPECTIVE JUROR POWELL:  They sued my work
22  environment, and I felt like they should not have done that.
23          THE COURT:  Now, in this circumstance you have Ms.
24  Benedicto who sued the City of Little Rock.  Would you hold
25  that against her?

1          PROSPECTIVE JUROR POWELL:  I'll be honest.  That

2    experience could pose a problem for me.

3          THE COURT:  Okay.  Mr. Powell, the fact that you say

4    that you -- that that causes a problem, I don't know that we

5    can have you as a juror.  And it doesn't mean you wouldn't be a

6    good juror in other cases.  And, like I said, you're allowed to

7    bring your personal experiences in.  You know that, right?  But

8    if it becomes a problem for you to listen to the facts of this

9    case --

10         PROSPECTIVE JUROR POWELL:  I think that the work

11   experience that I experienced would cause me a problem.

12         THE COURT:  Okay.  Unless -- and, Mr. Mann, you would

13   be the one who would object to this.  I'll give you a chance to

14   speak with him, but otherwise, I'm going to let him go and call

15   another juror.

16         MR. MANN:  I have no objection to you excusing him,

17   Your Honor.

18         THE COURT:  All right.  Mr. Powell, you can stand

19   down.

20       Call me another juror, please.

21         THE COURTROOM DEPUTY:  Ellen Tapley.

22         THE COURT:  Ms. Tapley, you just answered a question

23   for me not long ago, didn't you?  Or did you not?  I'm thinking

24   of somebody else who answered a question.  No.  That was not

25   you.

1       Ma'am, what's your name?  You answered a question for me
2  earlier.
3            PROSPECTIVE JUROR DOEPEL:  Vera Doepel.
4            THE COURT:  Ms. Doepel answered the question.
5       Ms. Tapley, have you answered any questions so far?
6            PROSPECTIVE JUROR TAPLEY:  Yes.
7            THE COURT:  Which one did you answer?
8            PROSPECTIVE JUROR TAPLEY:  I've been in management.
9            THE COURT:  Okay.  Any questions that I've asked so
10 far that you would have answered or would have raised your hand
11 to had you been seated in the first 18?
12           PROSPECTIVE JUROR TAPLEY:  No.  I have served on a
13 jury before.
14           THE COURT:  Okay.
15           PROSPECTIVE JUROR TAPLEY:  Just county.
16           THE COURT:  Anything about that experience that would
17 make it difficult for you to serve here?
18           PROSPECTIVE JUROR TAPLEY:  No.
19           THE COURT:  Was it a criminal, or civil case?
20           PROSPECTIVE JUROR TAPLEY:  Civil.  It was they ran a
21 stop sign and took it to court.
22           THE COURT:  Ms. Caton, you raised your hand and said
23 that you either have thought that you were discriminated
24 against or that someone treated you unfairly.
25           PROSPECTIVE JUROR CATON:  Well, it was my job that I'm

1    at, I was told that if I had a college degree, that they could

2    pay me more.

3            THE COURT:  Okay.  Now, you understand that having a

4    degree or not having a degree is not a basis to bring a

5    discrimination claim?

6            PROSPECTIVE JUROR CATON:  Right.  I mean, the way that

7    you asked that --

8            THE COURT:  Have you been treated unfairly?

9            PROSPECTIVE JUROR CATON:  Correct.  But I never

10   brought anything against anybody.

11           THE COURT:  From what I am gathering from you, your

12   job is a job that doesn't require any college degree?

13           PROSPECTIVE JUROR CATON:  Correct.

14           THE COURT:  But they said that they will pay you more

15   if you get one?

16           PROSPECTIVE JUROR CATON:  Yes, sir.

17           THE COURT:  Did they pay someone else more who had

18   one?

19           PROSPECTIVE JUROR CATON:  Yes, sir.

20           THE COURT:  I get that.  Anything about that, having

21   been treated unfairly and been given a reason for it, that

22   would make it difficult for you to serve here?

23           PROSPECTIVE JUROR CATON:  No.

24           THE COURT:  Would you come in here and if the City of

25   Little Rock comes in and says, "Well, look.  We have these

1   certain things and here is why we pay different amounts for

2   different things," would you, based on your experience,

3   immediately hold it against the City of Little Rock for --

4   simply because it paid differently for different things?

5              PROSPECTIVE JUROR CATON:  No, sir.

6              THE COURT:  I don't know that that's -- I'm just

7   throwing that out there.  I don't know what the evidence is

8   going to be.  Okay.

9       You disagree with the business decision made by the

10  company where you work, right?

11             PROSPECTIVE JUROR CATON:  Yes, sir.

12             THE COURT:  Because they pay you less than you think

13  you should be paid?

14             PROSPECTIVE JUROR CATON:  Because I had experience and

15  other people didn't, but it's life.

16             THE COURT:  I understand that.  In this case, if the

17  City of Little Rock says it made certain business decisions

18  based on certain factors, would you at least listen to them, or

19  would you immediately say, "Well, that's the same thing I heard

20  in my company and I don't buy into that" --

21             PROSPECTIVE JUROR CATON:  No, sir.

22             THE COURT:  -- before you even hear the evidence?

23             PROSPECTIVE JUROR CATON:  I will listen to -- I

24  believe everyone has a chance.

25             MR. MANN:  Your Honor, I didn't catch the juror's

1    name.

2           THE COURT:  Ms. Caton, C-a-t-o-n.

3       Anybody else who either on a job either has been treated

4    unfairly or someone has alleged you treated them unfairly?

5       Anybody else out here?

6       Okay.  I think I'm almost finished, but hold on just one

7    second.  Let me make sure.  Okay.  Let me ask you a couple of

8    these questions.

9       Any of you have any negative thoughts about our civil

10   rights laws in the United States, either, before we even get

11   started, say, they are unfair?  You know, you hear people

12   sometimes say, "Well, look.  I feel like there's reverse

13   discrimination, that we're so busy trying to help black folks

14   get rights, that we're actually discriminating against white

15   people."  Anybody feel that way?  And, look, I know that puts

16   you in a bad position where you don't want to raise your hand

17   and say, "I believe you black folks get too many rights."  I

18   mean, I know that's hard to say.

19      Here's what I would say to you.  And the reason why I

20   asked you that question, this is a case that involves a civil

21   rights law, Title VII, right?  And so I have to ask you that to

22   get you to examine how you view it because if you flat-out

23   disagree with the civil rights laws of the United States, we

24   need to know now because it would be very difficult for you to

25   enforce a civil rights law, because that's your job as the jury

1     in this case, if you don't agree with it.

2          And let me tell you how this normally comes up.  Normally

3     I have -- and this is where it's a little easier.  We have

4     cases like dope cases, right, marijuana cases, where people are

5     being prosecuted for trafficking in marijuana.  And there are

6     certain people who believe marijuana should be legalized.

7     Well, if you're on a jury where you have to find somebody

8     guilty and risk them going to prison for doing this and you

9     think it should be legal, how can you sit as a juror?  And I

10    usually have people say, "I disagree with the law, but I can

11    enforce the law as it's written."

12         Do I at least get from you that even if you disagree with

13    a lot of the civil rights laws, that if you're picked to serve

14    as a juror and the law says one thing, you could at least

15    enforce the law as it's written?  Anybody who just couldn't do

16    that?

17         Okay.  Anybody here who believes that the civil rights

18    laws don't go far enough?  You know, I get people who say that,

19    who say, "Look.  You know, we have all of these laws, but still

20    things are" -- Mr. Grubb says he thinks they don't go far

21    enough.  And we'll come back to that, Mr. Grubb.

22         And people say, "We have all of these laws, but, you know,

23    things are still the same.  We need to have more laws and we

24    need them to be stronger, have more teeth."  Anybody feel like

25    that?

1    And, Mr. Grubb, I'm not going to dig too deep on this, but

2  you've raised your hand.  In this case, you have Ms. Benedicto

3  suing the City of Little Rock.  And the law is what it is, and

4  at some point I will read the law to you what the elements are.

5  If you believe that the law is not strong enough or should be

6  stronger, can you follow the law as I give it to you?

7        PROSPECTIVE JUROR GRUBB:  Yes.

8        THE COURT:  And, you know, it may be that you say,

9  well, in a circumstance -- and I'll just throw this out.  I

10  don't know how this is going to work.  I don't know what the

11  witnesses are going to say.  I don't know anything about that.

12  In fact, you all will be sitting here watching these witnesses

13  testify for the first time just like I will.  But if it came

14  down to where you said, "Okay.  I disagree with the business

15  decision that the City made, but the law does not give Ms.

16  Benedicto the redress she seeks.  She wants this money for

17  this, but the law doesn't allow her to get it," will you sit

18  here -- will you interpret the law as it is, or will you say,

19  "Well, I think the law should give her money, and so I will do

20  that"?

21        PROSPECTIVE JUROR GRUBB:  Interpret it as best as I

22  can.

23        THE COURT:  Okay.  And I'll read it to you so there

24  won't be a lot of interpretation.

25        PROSPECTIVE JUROR GRUBB:  Okay.

1          THE COURT:  It will say what it says.  I would ask the

2    same thing of the other people who say, "Okay.  What if the law

3    gives her the redress she wants," and you're sitting here

4    saying, "I don't think the City should be on the hook for that.

5    You know, they didn't really do anything, so I'm going to rule

6    for the City."  You can't do either way.  You understand that?

7    Just because you think the law should be one thing doesn't mean

8    you can conform it to what you think.  You have to follow the

9    law as I give it to you.  Can all of you do that whether you're

10   for it or against it?

11         Last thing.  All right.  There's a judge in Iowa, Michael

12   Bennett, who has written this -- done some research on implicit

13   bias.  And he talks about how we all come -- we all have

14   certain experiences and life experiences that influence how we

15   view the world, you know.  And we don't even realize we view

16   the world the way we do, but we do.  And he says that when you

17   deal with jurors, we need to at least put it out on the

18   table -- and I do it all the time -- this is a case involving

19   race discrimination.

20         Now, it may be that some of you view -- however you view

21   all of this, do you understand that you have to follow the law

22   as I give it to you, and you can't let your -- although you can

23   let your personal experiences influence how you view things,

24   you can't let your personal views on this impact how you -- you

25   can't say, "Hey, look.  I think black folks have been

1    discriminated against, so I'm going to give a verdict to Ms.

2    Benedicto just because I think black folks have been

3    discriminated against."  You understand that.

4         And you can't say that, "Black folks have been

5    discriminated against or they used to be discriminated against,

6    but discrimination is over, so, therefore, I'm going to rule

7    for the City of Little Rock, and I don't believe any of this."

8    Do you understand that?

9         And do you understand that if you get back in the jury

10   room and you're not focusing on the facts of this case, what

11   happened here, you're not doing your job?  That your job is

12   simply to listen to the facts of this case and make a decision

13   based on this case?  You can't listen to one juror simply

14   because that juror is black and say that that juror, just

15   because of race, is telling the truth or not.  You can't look

16   at a juror because the juror is white and say, "I believe or

17   not simply based on race."  You can't look at a juror who might

18   be a woman and say, "I think women tend to tell the truth more

19   than men, so, therefore, I believe her regardless of what she's

20   saying," or, "I believe men are more, you know, truthful than

21   women."  You can't use those things.  Do you understand that?

22   And this sounds all very common, but you would be surprised at

23   how people view things and bring that into the jury.  And what

24   I ask all of you to do is, if ever you start thinking like

25   that, just put a personal check on yourself.  Will all of you

1    do that?

2         And will all of you also agree to me that if you get back

3    to the jury room and one of your fellow jurors starts bringing

4    up -- you know, this is a race case, so you're going to be

5    talking race, that you can say, "Well, hey, so and so is black

6    or so and so is white or whatever" -- you can do that.  But if

7    someone starts going into areas that really are not

8    appropriate, you'll put a check on it and say, "Look, that's

9    not why we're here.  We're here just to determine what happened

10   here"?  Will all of you agree to do that?  Will everybody out

11   there agree to do that?

12        And the final thing, is there anything I have not asked

13   you so far that had I asked you, you would have said, "Well,

14   Judge, I can't serve for that reason"?  Anybody here have a

15   health condition that will not allow you to sit here?  And I

16   know we have one person who we'll probably let go.  But is

17   there anybody here who has a health condition or anything else

18   that would make it difficult for you to sit here and listen to

19   this case?

20        Yes, ma'am.

21        PROSPECTIVE JUROR SELF:  I found out last Thursday

22   that I've got to see a neurosurgeon, and I do not have that

23   appointment yet, so I don't know when that will be.

24        THE COURT:  Do you think it might be in the next

25   couple of days?

1          PROSPECTIVE JUROR SELF:  I hope it will be, but I

2     really don't know.

3          THE COURT:  And, ma'am, what's your name?

4          PROSPECTIVE JUROR SELF:  Sandy Self, S-e-l-f.

5          THE COURT:  Let's do this.  I'm going to let Ms.

6     Benedicto and then Mr. Moore talk to the jury, and if we don't

7     have any more strikes, I'll let you go.  Okay.

8          Ms. Benedicto, do you have any questions you want to ask

9     the jury?  You can.

10          MS. BENEDICTO:  Yes, Your Honor.

11          THE COURT:  Okay.

12          MS. BENEDICTO:  Good morning.  I'm Ericka Benedicto,

13     as I mentioned earlier.  And thank you for being here today.

14     Hopefully, this won't take too long, but I do have some

15     questions in addition to some of the questions that Judge

16     Miller posed to you.

17          I do want to assure you that I do understand that

18     sometimes it's difficult to talk about race, especially in an

19     open forum, but what I just really want to know is your honest

20     opinion or beliefs about certain statements that I'm going to

21     read you.  I will not socially judge you.  Okay?

22          My first question is:  Have any one of you heard the term

23     or the statement, "We live in a post-racial society?"  Has

24     anyone heard that statement?

25          Okay.  I see some nodding.  I'm going to try to get your

1  names, I tried to capture them, but please help me out, and I'm

2  sorry if I call you wrong.

3       On the front row I saw a few people nod they heard that

4  statement.  Will you nod again so I can see who you are?

5       What is your name?

6            PROSPECTIVE JUROR BURGESS:  James Burgess.

7            MS. BENEDICTO:  Mr. Burgess, what is your opinion

8  about that statement, "We live in a post-racial society"?

9            PROSPECTIVE JUROR BURGESS:  I hear it in political

10  discourse on the news, pundits.  I've never used that term

11  myself talking to friends or things like that, but I hear it,

12  you know.

13            MS. BENEDICTO:  Okay.  You hear it.  What does that

14  term or that statement mean to you?

15            PROSPECTIVE JUROR BURGESS:  It means there are those

16  who believe that we've gone beyond that.  I kind of tend to

17  think that way myself in my own personal experiences.  I've

18  never been in the middle of any kind of problems that had to do

19  with race.  I've never been in a racial dispute with anyone.

20  It's never affected me personally.  So I don't really relate to

21  it in that way from a personal experience.

22            MS. BENEDICTO:  Okay.  Thank you.

23       I saw some others on the front row nod your head.

24       And what is your name?

25            PROSPECTIVE JUROR SHERRYL MILLER:  Sherry Miller.  Of

1    course it's a term if anyone listens to the news and if anyone

2    goes to different networks, it's a term that is used, a term

3    that is used now, of course, in the political race for

4    president.  Have I ever given it a whole lot of thought?  No.

5          MS. BENEDICTO:  Okay.  So, Ms. Miller, are you saying

6    that you don't have a thought one way or the other on what that

7    statement means to you?

8          PROSPECTIVE JUROR SHERRYL MILLER:  What it means to

9    me?  No, I haven't given it a lot of thought.  I have black

10   friends.  I have white friends.  Obviously diversity, which is

11   your area, is in the world and alive and well.  And I see no

12   problem with it.  It is a term that I'm sure all of us have

13   heard.

14         MS. BENEDICTO:  Ms. Miller, do you believe that racism

15   is a thing of the past?

16         PROSPECTIVE JUROR SHERRYL MILLER:  I do not believe

17   racism is a thing of the past.  I believe it becomes a

18   political issue sometimes when perhaps it should not be.  I

19   have also discovered, when I was growing up, all across this

20   country racism was alive and well then, but it could have been

21   against Indians because we were in the Southwest at that time.

22   It could have been blacks in the South.  It could have been

23   against poor white trash.  In a town I grew up in, I was poor

24   white trash.  So there's always prejudice everywhere.

25         MS. BENEDICTO:  Thank you for your response.

1        Someone else on the front row other than Ms. Miller?

2        Anyone else?

3        Okay.  I'm going to go to the second row.  Some heads

4    nodded as well.

5        Will you identify yourself?

6             PROSPECTIVE JUROR WACHTSTETTER:  Tim Wachtstetter.

7             MS. BENEDICTO:  Mr. Wachtstetter, what does that term

8    mean to you or that statement, "We live in a post-racial

9    society"?

10             PROSPECTIVE JUROR WACHTSTETTER:  I think it's the

11   desire of some to put racism behind us, probably a desire of

12   all to put racism behind us, and there are those that believe

13   we've effectively done so.

14             MS. BENEDICTO:  Okay.  What do you believe?

15             PROSPECTIVE JUROR WACHTSTETTER:  What do I believe

16   about racism?

17             MS. BENEDICTO:  Yes.

18             PROSPECTIVE JUROR WACHTSTETTER:  Institutional racism

19   is wrong.  Personal prejudices are difficult to eradicate

20   legally.

21             MS. BENEDICTO:  Okay.  All right.  Thank you.

22        Anyone else?

23        Yes.

24             PROSPECTIVE JUROR GRUBB:  I have definitely heard that

25   term in, you know, media, articles, that sort of thing.

1          MS. BENEDICTO:  What does that statement mean to you,

2     "We live in a post-racial society"?

3          PROSPECTIVE JUROR GRUBB:  That we no longer have -- we

4     no longer have institutionalized racism.  There are still, you

5     know, people run around doing white supremacy and that sort of

6     stuff, but as far as our government is concerned, there is no

7     racism or business practices.

8          MS. BENEDICTO:  Okay.  And is it Mr. Grubb?

9          PROSPECTIVE JUROR GRUBB:  It is, yes.

10          MS. BENEDICTO:  And what do you believe?

11          PROSPECTIVE JUROR GRUBB:  I don't believe that at all.

12     I believe there is definitely still institutionalized racism.

13          MS. BENEDICTO:  All right.  Thank you.

14     Anyone else?

15     And, by the way, if you see me jotting down, I'm just

16     trying to remember what you say, so when I take notes, that's

17     just what I'm doing.

18     Okay.  I have another question.  What is your response --

19     and I'll call by name since I'd like to hear from certain

20     individuals.  What is your response to this statement, "I

21     believe that blacks cannot racially discriminate against

22     blacks"?

23     Ms. Miller?

24          PROSPECTIVE JUROR SHERRYL MILLER:  I feel I'm being

25     picked on.  Blacks can racially discriminate against blacks.  I

1    do believe that that can happen, probably does happen.  Again,

2    my life experiences are a little different than others.

3    Discrimination, as I said, is alive and well on an individual

4    basis.

5             MS. BENEDICTO:  Is there anyone who believes that

6    blacks cannot discriminate against blacks?

7         So is everyone saying they believe that blacks can

8    discriminate against blacks?

9         Okay.  I see some of you shaking your head.  For those I

10   don't see anything, I'm going to ask specifically.

11        Is it Ms. Caton?  Did I pronounce your name correctly?

12            PROSPECTIVE JUROR CATON:  Caton.

13            MS. BENEDICTO:  What is your opinion on that

14   statement, or do you believe that blacks can discriminate

15   against blacks?

16            PROSPECTIVE JUROR CATON:  I believe they can

17   discriminate each other.  I mean, yes.

18            MS. BENEDICTO:  Okay.  Another statement.  What is

19   your opinion about the statement, "Education -- college

20   education is completely overrated.  It has no value"?  Does

21   anybody agree with that statement?

22        Does anyone -- I'm sorry.  Go ahead.

23            PROSPECTIVE JUROR WACHTSTETTER:  To say it has no

24   value would be an overstatement obviously.  But maybe a little

25   hyped up, maybe a little too hyped up.  I think that's what

1    we're starting to see, personally.

2           MS. BENEDICTO:  Okay.  What is your name?  I saw you

3    shaking your head.

4           PROSPECTIVE JUROR JOHNSON:  Mickey Johnson.

5           MS. BENEDICTO:  And what was your response to that?

6           PROSPECTIVE JUROR JOHNSON:  I'll agree with it.

7    College education is not for everyone.  There's lots of jobs

8    that do not require one.  And the idea that everyone

9    100 percent needs a college education, I think, is stretching

10   it quite a bit.

11          MS. BENEDICTO:  Okay.  All right.  Thank you.

12       Anyone else have a comment or opinion about that

13   statement?

14       Okay.  Another question, true or false.  And I'll ask each

15   one of you what you feel.  "For discrimination to happen, it

16   has to be intentional," is that statement true, or false, or

17   if -- you have no opinion on?  "For discrimination to happen,

18   it has to be intentional."

19       We'll start with you.  What is your name?

20          PROSPECTIVE JUROR JOHNSTON:  John Johnston.

21          MR. MANN:  May we approach, Your Honor?

22          THE COURT:  We can.

23       (Bench conference reported as follows:)

24          THE COURT:  What's the objection?

25          MR. MANN:  I object because the intentional

1    discrimination is the issue here.  And we're not talking about

2    disparate impact.  We're talking about intentional racial

3    discrimination treatment.  I think to question the jury and get

4    into this area is inappropriate.

5              THE COURT:  What's your response?  What Mr. Mann is

6    saying, the type of case you brought -- there are different

7    types of discrimination cases.  One is disparate impact.  That

8    would be a case where the City has a certain rule that harms

9    black people more than white people.  He said the case you

10   brought is a case where you say they intentionally

11   discriminated against you because you're black.  So what he is

12   saying is it would be inappropriate to start asking questions

13   about that.  I don't know how deep you're trying to go into

14   that.  I think his objection is correct.  This is an

15   intentional discrimination case.  So how deep do you plan to go

16   into this?

17             MS. BENEDICTO:  I just wanted just general views on

18   just the thoughts of discrimination, just trying to flesh out

19   what they think about discrimination.  Maybe --

20             THE COURT:  I will let you get up and do your voir

21   dire to explain to them that the case we have is a case

22   regarding intentional discrimination.  I'll let you explain it.

23             MR. MANN:  Okay.

24             THE COURT:  But I'll let her complete her thought

25   process.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1          MR. MANN:  Great.  That will work.

2          THE COURT:  I won't let you make any argument about

3     it.

4          MR. MANN:  I understand.

5          THE COURT:  You need to go through, reorient --

6          MR. MANN:  My point being is if Ms. Benedicto is going

7     to question about that, I don't want the jury to later

8     misunderstand the judge's instructions and think I don't have

9     to prove discrimination.

10          THE COURT:  You can continue.

11          MS. BENEDICTO:  Thank you.

12          (Proceedings continuing in open court as follows:)

13          MS. BENEDICTO:  Mr. Johnston, you were saying?

14          PROSPECTIVE JUROR JOHNSTON:  Okay.  It's hard for me

15     to say true or false.  Okay?  And I'll tell you why.  I think

16     that racism is -- can be intentional, and I think it can be

17     accidental at the same time.  It's hard to weigh one way or the

18     other because, through my life, I've seen it both ways.  So

19     it's hard to say true or false.

20          MS. BENEDICTO:  Does anyone differ from -- have a

21     different opinion from what Mr. Johnston expressed?

22          PROSPECTIVE JUROR GRUBB:  I would say true.

23          MS. BENEDICTO:  Okay.  Will you elaborate?

24          PROSPECTIVE JUROR GRUBB:  I think there has to be some

25     sort of something in the system or in somebody's mind that is

1    intentionally accounting for race.

2            MS. BENEDICTO:  Okay.  All right.  Thank you.

3            PROSPECTIVE JUROR SHERRYL MILLER:  I say the statement

4    is true.

5            MS. BENEDICTO:  Okay.  Thank you, Ms. Miller.

6        Anyone else?

7        Okay.  Let me review my notes and see if I -- okay.  I

8    think I have pretty much gotten all of the information that I

9    can get -- I would like to get from you at this time.

10       So, Your Honor.

11           THE COURT:  Okay.  Come to the bench.

12       (Bench conference reported as follows:)

13           THE COURT:  I just wanted to give you a chance.  Is

14   there anybody you wanted removed for cause?  Okay.  I

15   understand you still have your three peremptory challenges.

16   When we're finished, you can name the three you want removed.

17   Is there anyone on that jury right now who you think there is a

18   cause, either because of a response they gave, for having them

19   removed?

20           MS. BENEDICTO:  Yes, Your Honor.

21           THE COURT:  Let's do that now.

22           MS. BENEDICTO:  Okay.

23           MR. MANN:  May I retrieve my list?

24           THE COURT:  You can.

25           MS. BENEDICTO:  Let's see here.  It was the

1     gentleman -- I'm looking for his name -- front row, the

2     eighth chair.

3              THE COURT:  That's Mr. Burgess.

4              MS. BENEDICTO:  Yes.

5              THE COURT:  What response?

6              MS. BENEDICTO:  He stated that -- while he was

7     talking, I put a star by his name.  He stated he has no

8     experience with -- he cannot relate in any form or fashion to

9     this type of discrimination.  And he's just clearly stated he

10    just cannot --

11             THE COURT:  Okay.  Do you have anybody else you would

12    also --

13             MS. BENEDICTO:  Yes.  Jennifer Caton.  She is --

14             THE COURT:  Okay.

15             MS. BENEDICTO:  And she stated early on that she just

16    has a problem with -- she doesn't have a degree and she's not

17    being compensated as highly as she thought she should be.  She

18    just seems to have a built-in bias toward --

19             THE COURT:  Let me do this.  I'll overrule you on

20    Mr. Burgess because the fact he just doesn't have any

21    experience with this and doesn't understand it doesn't mean he

22    can't be fair when he hears the evidence.

23        Ms. Caton is a different story.  I'll give you a chance to

24    respond.  I'm not saying you've met the burden, but this is

25    something we need to get into.  Ms. Caton says, "Look.  I'm on

1    a job where I don't have a college degree, somebody else does.

2    It's a job that doesn't require a college degree.  And they are

3    not paying me what I need to be paid simply because I don't

4    have a college degree and somebody else does."  She says, "I'm

5    being treated unfairly."  That's why I asked her the question.

6    Well, in this case, because I know part of your -- Ms.

7    Benedicto's case is you have a master's degree, the other two

8    people being paid more than you do not have master's degrees,

9    they have bachelor's degrees.  So part of your case is to

10   explain to the jury, "I was more qualified based on education

11   and, therefore, should have been paid at least as much."  And

12   your concern, I know, is that Ms. Caton is on the other side of

13   that.

14        What's the response, Mr. Mann?

15        MR. MANN:  Your Honor, in addition to what she said,

16   she said that, she was at the -- counter to that, she was told

17   she would be paid more if she had a college degree.  She

18   disagreed with that business decision.  It sounded to me like

19   she was -- could go either way.

20        THE COURT:  I think, ultimately, Ms. Benedicto, what

21   she said was, "I understand it's the system.  I don't have a

22   degree, so I don't get it."  And so the implication being that,

23   although she disagrees, she recognizes she doesn't have a

24   college degree.

25        MS. BENEDICTO:  Okay.


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1    THE COURT:  I don't think we should say it would make

2    her inherently bias.  But you get to decide whether you want to

3    strike her on your three.  I think for cause, that wouldn't be

4    a reason to do it.

5            MS. BENEDICTO:  Okay.

6            THE COURT:  Do you have anybody else you want?

7            MS. BENEDICTO:  No.

8            THE COURT:  Understand this as we go forward, Ms.

9    Benedicto.  If you have any objections to things like this, you

10   have to bring it to my attention, I have to rule on it, because

11   if you don't prevail in your lawsuit and you want to appeal, it

12   will be this stuff that you raise with the Court of Appeals --

13           MS. BENEDICTO:  Okay.

14           THE COURT:  -- on appeal.  So make sure you let me

15   know, make sure we get a record of it, and I'll rule on it, and

16   then you'll have your record for appeal if you need to.

17           MS. BENEDICTO:  Yes, Your Honor.

18           THE COURT:  Mr. Mann, are you ready?

19           MR. MANN:  Yes, Your Honor.

20       (Proceedings continuing in open court as follows:)

21           THE COURT:  All right, Mr. Mann, you may inquire.

22           MR. MANN:  Thank you, Your Honor.

23       Good morning again.  I'm Bill Mann, as I mentioned to you

24   earlier.  And I want to say, first of all, that I appreciate

25   you being here and your service.  I know this is a civic

1    responsibility and it's taking you away from things.  I don't

2    have young kids anymore, so spring break doesn't bother me.

3    But I know that some people had spring break plans possibly,

4    and I sure am sorry if we have caused you to miss something,

5    but I hope you won't hold it against either the City of Little

6    Rock or Ms. Benedicto.  This, as everyone has told you, is an

7    important case.  And we appreciate your service.  And we'll do

8    our best to, as we go along, be as concise as possible.

9         As Judge Miller said, we all come into a courtroom with

10   different life experiences which cause us to think one way,

11   feel one way, maybe think negatively about something,

12   positively about something.  And what the voir dire process is

13   is to find out if there are any such feelings that we have that

14   would make this the kind of case that wouldn't be best for us.

15   Maybe a race discrimination case is not the one we should sit

16   on.  Maybe we would be more suited for a car wreck case, or a

17   big business dispute over money, or purchasing a company,

18   something like that.  So that's the only purpose in us asking

19   these questions.  I just want you all to understand.

20        I know you all said that -- there was some discussion

21   about whether you had been a supervisor in your company and

22   whether you had any problems there.  I want to ask you all as a

23   panel, has anyone in their job, that you hadn't already

24   mentioned, had any sort of issue where you felt like your boss

25   treated you negatively or unfairly in some way?  Nobody?

1           Yes, ma'am.

2               PROSPECTIVE JUROR HOLLADAY:  I was doing construction

3      siding for awhile, and that's a man's job, I was told by many.

4               MR. MANN:  And your name, ma'am?

5               PROSPECTIVE JUROR HOLLADAY:  Jenna Holladay.

6               MR. MANN:  You said you were in construction siding,

7      and you had the feeling while you were in that particular

8      business --

9               PROSPECTIVE JUROR HOLLADAY:  It wasn't a feeling.

10              MR. MANN:  You were told.  You were outright told,

11     "This is man's work."

12              PROSPECTIVE JUROR HOLLADAY:  Man's job.  Women

13     shouldn't be working.

14              MR. MANN:  And how long did you work at that company?

15              PROSPECTIVE JUROR HOLLADAY:  Five years.

16              MR. MANN:  Were you told that throughout the --

17              PROSPECTIVE JUROR HOLLADAY:  I heard it from a lot of

18     people.  I heard it from other employees and everybody that was

19     above me or around, I mean.

20              MR. MANN:  Did you feel like when you were in that

21     job, because of that attitude, that you were treated unfairly

22     in terms of, say, salary increases?

23              PROSPECTIVE JUROR HOLLADAY:  No.

24              MR. MANN:  Do you feel like you were treated as fairly

25     as anybody else?

1          PROSPECTIVE JUROR HOLLADAY:  I made about the same as
2     everybody else.
3          MR. MANN:  There were no men who were paid more than
4     you doing the same type of work you were doing?
5          PROSPECTIVE JUROR HOLLADAY:  I outlasted a lot of
6     them.
7          MR. MANN:  Is there anything about your experience
8     working in that business where you were told that that was
9     man's work that would cause you a problem sitting on this case?
10          PROSPECTIVE JUROR HOLLADAY:  No, sir.
11          MR. MANN:  Okay.  Thank you.
12       Now, there was one part of Ms. Benedicto's voir dire which
13     I wanted to follow up on, and that is, when she made reference
14     to intentional discrimination, intentional racial
15     discrimination.  In this particular case, that is, in fact, the
16     allegation, Ms. Benedicto is claiming that the City
17     intentionally discriminated against her in terms of her salary.
18     Do you all understand that?  Okay.  Does that kind of a --
19     knowing what kind of case it is, that intentional
20     discrimination must be proved, does that cause anybody any
21     issues sitting on this case?  Okay.
22       Now, as His Honor said, Ms. Benedicto is representing
23     herself today and she has that right.  And she's done a very
24     nice job in voir dire, I might add.  But I do want to ask you,
25     since I am a lawyer representing the City against someone who

1   is acting pro se, does that cause you all to think one way or

2   another about -- for instance, you would be -- you would tend

3   to believe more Ms. Benedicto's side since she doesn't have a

4   lawyer?  Does that create a problem for anybody?  Everybody

5   understands you can represent yourself if you want to, or, if

6   you have a lawyer, you can send that lawyer in to represent

7   you?  No one has any issue?  That would not cause any of you to

8   think one way or another, pro or con either side?  Okay.

9        Now, you all mentioned that you had had no issues with

10  your -- with the City of Little Rock government, I think, but I

11  want to ask you about your own hometowns.  I know you all live

12  in a lot of different places.

13       I think, Ms. Miller, didn't you say you were from

14  Griffithville?

15            PROSPECTIVE JUROR SHERRYL MILLER:  No.  I'm from

16  Little Rock.

17            MR. MANN:  Someone is from Griffithville, I thought.

18            PROSPECTIVE JUROR LORETTA MILLER:  I am.

19            MR. MANN:  Thank you, ma'am.

20       In your own hometowns, have you had any issues with your

21  city government that caused you to have a problem with

22  government, to maybe make calls and complain, something that

23  would cause you to think:  Well, if my hometown treated me like

24  this, maybe the City of Little Rock could have possibly done

25  that, too?  Anybody have a problem with that?

1          Everybody has had good experiences with their hometowns?

2    Good.

3          Has anyone on the jury ever worked in the area of

4    personnel or human resources, anything like that, where you're

5    part -- you're part of the hiring process, you interviewed

6    folks, you hired people?

7          Mr. Burgess, you do?

8          PROSPECTIVE JUROR BURGESS:  Yes, I have.  It was not

9    human resources, but I am a manager that people report to me

10   and I've done interviews and had to hire and -- yes.

11         MR. MANN:  Okay.  Have you, as a result of your work

12   in hiring folks, ever had any employees make a complaint

13   against you or your company that you had to deal with?

14         PROSPECTIVE JUROR BURGESS:  No.

15         MR. MANN:  Okay.  What about any of, I think -- yes,

16   ma'am.

17         PROSPECTIVE JUROR HUMPHRIES:  In that regards, I've

18   also interviewed employees and hired too.

19         MR. MANN:  Okay.  And you're Ms. Humphries?

20         PROSPECTIVE JUROR HUMPHRIES:  Uh-huh.

21         MR. MANN:  Anything about that process that would

22   cause you to be for or against either side in this particular

23   case?

24         PROSPECTIVE JUROR HUMPHRIES:  (Shaking head.)

25         MR. MANN:  That's a no?  The only reason I ask you is

1   the court reporter is taking it down.

2           PROSPECTIVE JUROR HUMPHRIES:  No.

3           MR. MANN:  Thank you.  Ever had anybody who, say, you

4   interviewed three or four people for a particular job and you

5   selected someone, any situation have you encountered where the

6   person who didn't get the job made a complaint?

7           PROSPECTIVE JUROR HUMPHRIES:  No.

8           MR. MANN:  So none of you all have had issues.  Any of

9   your close friends or family, your best friends and your

10  family, if you think about it, any of them ever had any issue

11  with their employer that they told you about, like they said,

12  you know, "Joe Blow Company treated my son wrong or my cousin

13  wrong or my buddy I went to college with," anything like that?

14  Anything that might cause you to have pro or con feelings about

15  the City of Little Rock or Ms. Benedicto?  Okay.

16          Now, I think, Mr. Grubb, there was a question posed by Ms.

17  Benedicto in which she asked if -- or maybe it was the judge.

18  I think it was Judge Miller, in fact, when he asked if you

19  thought the civil rights laws didn't go far enough.  And you

20  made -- you gave an answer to that and I was having a little

21  trouble hearing.  Could you go back and repeat that for me and

22  tell me your feelings?

23          PROSPECTIVE JUROR GRUBB:  Yeah.  I -- well, it really

24  just stems, I think there's a lot of institutionalized racism,

25  and that I -- not necessarily that the civil rights laws don't

1    go far enough, but that there's a lot of people that are

2    against them, and I don't think that's correct.  And I think

3    that there should be more changes made to stem

4    institutionalized racism.

5            MR. MANN:  You think there should be more work done to

6    prevent institutionalized racism?

7            PROSPECTIVE JUROR GRUBB:  Yes.

8            MR. MANN:  And just because someone makes a claim that

9    they were discriminated against for any reason, race or gender

10   or whatever it might be, just because a complaint is made, that

11   would not lead you to believe that it was necessarily

12   definitely true, is that right?

13           PROSPECTIVE JUROR GRUBB:  That is right.

14           MR. MANN:  Okay.  I wanted to follow up with

15   Ms. Caton.  I think that you mentioned in your -- during Ms.

16   Benedicto's voir dire questions, or perhaps it was Judge

17   Miller's -- I can't remember now -- that you had a situation at

18   your work where you do not have a college degree, but you were

19   told that you would be paid more if you had one?

20           PROSPECTIVE JUROR CATON:  Yes, sir.

21           MR. MANN:  Is that right?  And I think I also recall

22   that you said that your particular job doesn't require you to

23   have one?

24           PROSPECTIVE JUROR CATON:  No, sir.  Where I work you

25   are not required to have a degree, a college education or

1    anything.  But when I signed in with orientation, they told me
2    how much I was going to make, the employer did say, "Well, you
3    know, if you had a college degree, I could pay you more."  I
4    was like, "Well, I'm sorry.  I chose to stay home with my
5    children."
6              MR. MANN:  Okay.  How long have you worked with your
7    particular company?
8              PROSPECTIVE JUROR CATON:  It will be three years in
9    June.
10             MR. MANN:  Okay.  Anything about that decision that
11   you feel would cause you to be uncomfortable sitting on this
12   particular case where there might be some -- might be some
13   testimony dealing with college educations?
14             PROSPECTIVE JUROR CATON:  No, sir.
15             MR. MANN:  Okay.  Now, I wanted to ask all of you a
16   question.  I think I said to you when I was introducing
17   Ms. Wrather that I couldn't bring the whole City of Little Rock
18   in here to be the defendant.  We have to have a representative,
19   and that's Ms. Wrather today.  And one thing I wanted to talk
20   to all of you about is this.  Do you understand that despite
21   the fact that the City of Little Rock is the defendant, it's
22   Ms. Benedicto versus the City of Little Rock, that the
23   decisions that she is challenging and that are claiming as
24   being race discrimination against her are made by people?  In
25   other words, a city acts through its people, its employees, its

1    management.  Does everybody understand that?  And when you're

2    evaluating the evidence and the testimony in the case, when

3    someone is on the witness stand who is an employee of the City

4    of Little Rock, will you all be able to focus on that person,

5    their testimony, and understand that this is a person making

6    this decision who works for the City of Little Rock?  Everybody

7    okay with that?  Okay.

8         Let me check my notes one second.  I may be done.

9    Everybody has been very thorough, leaving me with nothing to

10   do.

11        I think that's all I have.  Again, I want to thank you for

12   your time and attention.  We appreciate it very much.

13            THE COURT:  Mr. Mann, did you have anything you wanted

14   to bring to the bench?

15            MR. MANN:  Pardon me, sir?

16            THE COURT:  Did you have anything to bring to the

17   bench?

18            MR. MANN:  No, Your Honor.

19            THE COURT:  Ms. Benedicto, did you have any follow-up

20   questions for the jury?

21            MS. BENEDICTO:  No, Your Honor.

22            THE COURT:  All right.  Here's what we're going to do.

23   I'm going to give -- first, Ms. Brooke Smith, I'm going to

24   release you.

25        And, Ms. Self, I'm going to release you.  Based on the

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    responses you gave, there's no need for you to hang around.

2         And you all can leave until further notice.

3         Here's what we're going to do.  We're going to take a

4    15-minute break until about 10:45 or a little bit after.  When

5    you come back, don't sit in the chairs you now occupy.  Sit

6    back in the back.  The lawyers now have an opportunity -- there

7    are two ways that you can be removed from a jury -- from the

8    jury.  One is by challenges for cause.  Any of those people who

9    I have let go so far are people who have been challenged for

10   cause -- primarily I was the one challenging them.  And usually

11   that's based on either they know somebody or for some reason

12   they can't sit as a juror in this case.

13        Now, however, each side gets three peremptory challenges,

14   where they can list three jurors who can be removed from the

15   jury for no reason or any reason at all.  It doesn't have to --

16   it can be based on anything, except you can't be removed for a

17   discriminatory purpose.  So somebody can't remove you just

18   because you're white or can't remove you just because you're a

19   woman or a man or whatever.  But for any other reason, they can

20   remove you.

21        So to give them a chance to write down the three names of

22   the three people they want to have removed, we're going to take

23   15 minutes.  They'll hand those in.  And when you come back,

24   we'll call our 12 jurors.

25        Okay.  Let's stand down for 15 minutes.


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1          (Prospective jurors exit the courtroom.)

2          THE COURT:  Let me say this.  For Ms. Benedicto and

3   for Mr. Mann, what we will do, since we're so early, we will

4   go -- once we seat the jury, I'm going to read them the

5   instructions, I'm going to release the other jurors, and then

6   we're going to go straight into opening statements, so have

7   your notes and everything together and be ready to go into

8   opening statements as soon as we seat the jury.  Okay?

9          MR. MANN:  Yes, Your Honor.

10          MS. BENEDICTO:  Yes, Your Honor.

11          THE COURT:  Okay.

12          (Recess from 10:35 a.m. until 10:49 a.m.)

13          THE COURT:  All right.  Ms. Tyree, call our 12 jurors.

14          THE COURTROOM DEPUTY:  John Johnston.  Loretta Miller.

15   Robbie Gilson.

16          PROSPECTIVE JUROR GILSON:  Gilson.

17          THE COURTROOM DEPUTY:  Gilson.  I'm sorry.

18      James Bennett.  Ruth Ellen Binford.  Sherryl Miller.

19   Ellen Tapley.  Shannon Bailey.  Jennifer Caton.  Patricia

20   Hotle.  Timothy Wachtstetter.  Mickey Johnson.

21      That's 12, Your Honor.

22          THE COURT:  Okay.  All right.  These are the 12 jurors

23   that remain after the exercising of the six peremptory

24   challenges.

25      Ms. Benedicto, is this jury good for the plaintiff?


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1          MS. BENEDICTO:  Yes, Your Honor.

2          THE COURT:  And, Mr. Mann, is this jury good for the

3     defense?

4          MR. MANN:  Yes, Your Honor.

5          THE COURT:  All right.  Ladies and gentlemen, would

6     you rise so Ms. Tyree can get you sworn in?

7          (Jury sworn.)

8                    C E R T I F I C A T E

9        I, Judith A. Ammons, Official Court Reporter, do hereby

10    certify that the foregoing is a true and correct transcript of

11    proceedings in the above-entitled case.

12

13    /s/ Judith A. Ammons, RPR, CRR, CCR   Date: August 6, 2016
          United States Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25